IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Ada Irene Dawson, | ) | Civil Action No. 3:05-2308-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| United States of America, Former Director | ) | |
| Louis J. Freeh in his official capacity as Director, | ) | |
| and Director Robert S. Muller, in his official | ) | **REPORT AND RECOMMENDATION** |
| capacity as Director, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Ada Irene Dawson ("Dawson"), filed this action on August 11, 2005. She is a long-time employee of the Federal Bureau of Investigation ("FBI") in its Columbia, South Carolina field office. Dawson alleges Title VII claims for race discrimination, a racially hostile work environment, and retaliation.[1] The defendants are the United States of America and a former and a present Director of the FBI in their official capacities. Defendant, Paul C. LaCotti ("LaCotti"), Assistant Special Agent in Charge ("ASAC") of the Columbia field office, was dismissed as a party by order filed July 11, 2006.

Instead of filing an answer, defendants filed a "Motion to Dismiss, or in the Alternative for Summary Judgment," on December 15, 2005. A hearing was held on the motion on June 29, 2006. The undersigned advised the parties that insofar as defendants sought dismissal under Fed. R. Civ. P. 12(b)(6), their motion was without merit and that their motion for summary judgment was premature since no answer has been filed and no discovery had been conducted. Defendants were

---

[1]This case was automatically referred to the undersigned for pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 73.20(B)(2)(e) and (g).

given the option of withdrawing their motion or litigating further their motion to dismiss. Defendants withdrew their motion on July 5, 2006. A scheduling order was issued on July 11, 2006, requiring defendants to file an answer on or before July 20, 2006. The answer was filed on that date and the parties pursued discovery.

Defendants filed a motion for summary judgment on March 15, 2007. Plaintiff filed an opposition memorandum on April 2, 2007. Initial review of the pleadings indicated that the parties made numerous citations to documents that were not a part of the record before this court. A status conference was held on October 19, 2007, at which the undersigned requested: (1) plaintiff to specifically object to defendants' detailed "Statement of Uncontested Facts" contained in their memorandum in support of summary judgment; (2) defendants to supplement the record to include all material cited in their pleadings, and (3) plaintiff to brief several issues raised by defendants. The record was supplemented by defendants on October 23, 2007. Plaintiff filed a supplemental brief on October 31, 2007.

This process has resulted in a voluminous and overlapping record. In addition to the attachments to the memoranda of the parties (Pl. Mem., Ex. ___; Pl. Supp. Mem., Ex. __; and Def. Mem., Ex. ___), the record now includes plaintiff's deposition taken November 22, 2004 during the administrative process (Pl. Dep., ___), plaintiff's deposition in this case begun on February 16, 2007 and concluded on March 13, 2007 (Pl. Dep. II, ___), a two-volume EEO Investigation (EEO Invest., Ex. ___), and a two-volume transcript of the administrative hearing (Ad. Hrg. ___).

## Facts

As mentioned above, defendant's brief listed 89 separately enumerated "uncontested facts" which Dawson has challenged in part. Dawson's objections generally relate to emphasis and

inference.  Defendants' discipline of Dawson, which is the subject of this action, is well documented by Dawson and her supervisors.  The essential facts are mostly undisputed.

Dawson, an African-American female, began working for the FBI in Columbia as a clerk stenographer when she was nineteen years old.  She rose through the ranks and became Secretary to the Special Agent in Charge ("SAC") in 1984 (Ad. Hrg. 13).  Dawson's performance evaluations were generally good until 2001.  The FBI utilized a Performance Evaluation Report ("PAR") in evaluating the job performance of its employees.  The ranking levels were unacceptable, minimally acceptable, fully successful, superior, and exceptional. (Ad. Hrg. 16-19).

George Burttram ("Burttram") succeeded Dodge Frederick as SAC in February of 2000 (Ad. Hrg. 289).  At that time, Steve Hooks was the ASAC.  Cheryl Pelkey ("Pelkey"), a white female, was Secretary to the ASAC.  The "front office" was configured with a common secretarial area between the offices of the SAC and ASAC.

    a.    **Dawson/Pelkey**

When Burttram arrived, he noticed Pelkey was not physically located in the common area with Dawson, but in an office down the hall.  Inquiry revealed that the separation was caused by previous friction between Dawson and Pelkey.  This arrangement caused problems with coverage of the front office.

    1.    Burttram discussed the situation with Dawson and Pelkey, individually and together, and Pelkey was returned to the front office.

    2.    Tension between Dawson and Pelkey persisted.  On June 2, 2000, "Ms. Pelkey left the office in the afternoon after Ms. Dawson complained to her about the office environment." (Def. Mem., Ex. 1).

3.      On June 5, 2000, Burttram and his Administrative Officer met with Dawson

and Pelkey.  Burttram directed Dawson and Pelkey to notify him, the ASAC,

and each other of leave status to insure front office coverage; to coordinate

lunch and other breaks; and to assist each other with work projects. (Id.)

**b.      LaCotti Arrives**

LaCotti transferred to the Columbia office and became ASAC in July of 2000.  He

manned the ASAC desk in the turbulent front office with Pelkey as his secretary.

**c.      PAR - August 2000.**

In August of 2000, Burttram evaluated Dawson and gave her the highest overall

rating, "exceptional."   He rated her as exceptional in the "critical elements" of

communications control and administrative support, and as "superior" in the critical

element of administrative analysis. (Def. Mem., Ex. 2).[2]

**d.      Filing Problems.**

In the latter half of 2000, Burttram needed to review a particular file.  Dawson was

absent and the file could not be found.  The search through files maintained by

Dawson for the missing file showed that Dawson was not complying with FBI filing

procedures.  Burttram counseled Dawson on this subject on her return and instructed

her to correct the filing deficiencies.  Problems with filing issues continued. (Ad.

Hrg. 314-16).

---

[2]During the administrative hearing, Burttram testified that he gave Dawson this rating although it was undeserved.  According to Burttram, the rating was given because he felt Dawson had the potential to be an exceptional employee and that she was making a good faith effort to mend her differences with Pelkey.  Burttram testified that he fully explained his reasoning to Dawson (Ad. Hrg. 305-307).

e.    **LaCotti v. Dawson**

Dawson testified that as early as October of 2000 LaCotti engaged in a daily and continuous campaign to drive her from the front office and out of the FBI. Dawson testified that LaCotti subjected her to harassing treatment, frequently yelling at her. At a retirement luncheon for an FBI employee, LaCotti criticized Dawson for leaving the front office uncovered. During this encounter, LaCotti may have touched Dawson on the arm. (Ad. Hrg. 22. 46-48, 184-87, 474; Def. Mem., Ex. 5).

f.    **Unhappy New Year - January 8, 2001**

On January 8, 2001, Dawson "instigated" a conversation with Burttram concerning "the way the ASAC [LaCotti] talks to me and treats me, especially when you are absent." (Def. Mem., Ex. 4). Burttram told Dawson that LaCotti felt that she was not doing her job proficiently. Dawson's job performance was discussed, and Burttram told Dawson if she felt like she was being discriminated against because of her race she should contact the EEO office. Dawson responded that she would contact the HQ EEO office in Washington. Burttram wrote Dawson a letter commemorating the conversation, and Dawson wrote a response to Burttram on the same date. (Id.).

Also on January 8, 2001, Burttram authored another memorandum concerning the front office operations with copies to Dawson, Pelkey, LaCotti, and others. The memorandum stated:

The following instructions are being reiterated:

The front office is to be staffed during working hours. The front office secretaries will coordinate this and arrange for reliefs. Short absences can be coordinated with the SAC and ASAC.

Front office secretaries are expected to arrive on time. All annual leave is to be approved in advance. Emergency and sick leave require the permission of the SAC/ASAC.

Front office staff are expected to coordinate their duties. Failure to do so will be considered a performance issue.

Calls are to be business related and professionally handled.

Due to the secretarial shortage, front office is expected to assist in office typing. Should assigned duties prevent this assistance, a written explanation is to be provided to the SAC.

Problems with or among front office staff are to be provided to the SAC/ASAC immediately – no exceptions.

It is expected that the senior front office staff will conduct themselves professionally and courteously at all times.

(Def. Mem., Ex. 3).

### g.    SOB - February 15, 2001

During a telephone conversation with another FBI employee on February 15, 2001, Dawson used a derogatory term in referring to LaCotti. This was overheard by Pelkey, who reported it to LaCotti, who in turn reported to Burttram that Dawson had referred to him as a "son of a bitch." Burttram interviewed Dawson, and she provided him with a written statement of what happened in which she stated in part, "I'm sure I did use a few choice words." Burttram concluded that "(i)t appears from the facts that Ms. Dawson did utilize an unprofessional term, in violation of Bureau regulations and will not be tolerated." In his memorandum, Burttram advised

6

Dawson that "(a)ny further reoccurrence of this behavior will result in administrative action." On February 22, 2001, Dawson wrote a response to Burttram's memo in which she did not deny using a derogatory term about LaCotti, but that if she did, it would have more likely been "asshole" rather than "son of a bitch." (Def. Mem., Ex. 5).

**h.     PAR - March 2001**

In March of 2001 Burttram rated Dawson as "fully successful" on her PAR and pointed out areas in which she needed to improve. Dawson disagreed with the PAR and refused to sign it. According to Dawson, this PAR resulted from LaCotti reporting inaccurate, critical information about her to Burttram. (Ad. Hrg. 79-82; EEO Invest. 18). Dawson appealed the PAR, but it was upheld.

**i.     Insubordination - June 14, 2001**

On June 14, 2001, Dawson told Burttram that she was hungry and was going to go downstairs to obtain something to eat. Burttram asked if Pelkey was there to answer the phones. Dawson told Burttram that Pelkey had been away for some time and she intended to go downstairs. Burttram instructed Dawson to find Pelkey before she left. Burttram again stated that Dawson should wait and that he would find Pelkey. Burttram found Pelkey and when they returned to the front office, Dawson was not there. (EEO Invest., Ex. 9K).

**j.     Filing Problems Continued**

In June of 2001 Burttram determined that Dawson had not resolved the ongoing issues with filing. For two days, Burttram and his administrative officer went

through all of Dawson's files with her, instructing where documents should properly be filed, and destroying over a hundred documents. (Ad. Hrg. 316-17).

**k.      Performance Plan - July 16, 2001**

In order to assist Dawson with improving her work, Burttram placed her on a "Performance Plan" on July 16, 2001. The Performance Plan stated seven "critical elements" with "performance standards" listed for each one. (EEO Invest., Ex. 22). The Performance Plan advised Dawson that if she performed at a "Does Not Meet Expectations" ("DNME") level during the period on any element, she could be reassigned, demoted, or removed. (Id.).

**l.      Office Disruption - September 12, 2001**

Dawson returned from leave on September 12, 2001, to find her desk stacked with work. According to Dawson, "(d)ue to the volume of noise in the front office from employees talking loudly, I put my fingers over my ears which assists me in concentrating during such disturbances." While Dawson was in this posture, another employee approached to obtain some information from her. Dawson did not respond to the employee, even though the employee called Dawson's name loudly three times. The employee told her supervisor of the incident who in turn notified Burttram. During a meeting to discuss the incident, Dawson indicated that she did not see or hear the employee who tried to get her attention. (EEO Invest., Ex. 35).

**m.      Burttram Prepares to Leave**

Burttram decided to leave the FBI at the end of September of 2001. In preparation for his departure and to provide a record for the successor, Burttram took two actions. First, Burttram referred the incidents of February 15 ("SOB"), June 14

8

(insubordination), and September 12 (office disruption), 2001, to the FBI's Office of Professional Responsibility ("OPR") for an independent determination as to whether further action should be taken (Ad. Hrg., 327). Ultimately, OPR found that the first two incidents were substantiated. The third issue was referred back to the SAC to be handled as a performance-related issue. Dawson was suspended for seven days and placed on probation for a year. (EEO Invest., Ex. 34).

Second, on September 24, 2001, Burttram gave Dawson a "progress review" for the period from March 26, 2001 (the date of the "fully successful" PAR) through September 20, 2001. Burttram rated Dawson as DNME and provided her with an "assistance statement" to help her raise her performance. The assistance statement stated:

1. Employee will act in a professional manner with Division employees and management.

2. Employee will accept in a positive manner criticism and suggestions for improving her performance. She will endeavor to make changes necessary to implement these recommendations.

3. Employee will organize her work load, administrative systems and reference material in a manner that will allow management to retrieve material readily, properly access her workload and obtain reference material when needed.

4. Employee will coordinate her activities in the front office with managers and staff as directed.

5. Employee will endeavor to acquire additional job skills, particularly in the computer area and will readily share these skills with other employees.

6. When given projects, employee will complete these projects within established deadlines and in the manner directed.

When unsure of assigned duties, she will make inquiries to resolve the issues before the project due date.

7.      Employee when able, will make her availability for additional assignments know to Division managers.

(EEO Invest., Ex. 9A).

Dawson was advised that a failure to comply with the assistance statement could result in a "Warning PAR" by Burttram's successor (EEO Invest., Ex. 9A).

**n.      LaCotti Replaces Burttram - October 1, 2001**

Burttram left on September 30, 2001 and LaCotti became Acting SAC effective October 1, 2001. On that day both he and Dawson signed and dated the Performance Plan which had been established by Burttram on July 16, 2001 (EEO Invest., Ex. 22; Ad. Hrg., 461-62)

According to LaCotti, he attempted to counsel Dawson to help her improve her performance based on the assistance plan (Ad. Hrg. 465). Dawson maintains that LaCotti did not counsel her, but merely used the counseling sessions to yell at her. (Id. at 46).

**o.      Filing Problems Continued**

In December of 2001, LaCotti asked Dawson several times to bring him a vital file that was relevant to regular financial audits conducted pursuant to FBI procedure. Dawson could not locate the file and told LaCotti it was either misfiled or lost. Eventually, LaCotti, searching late into the night, found the audit file misplaced in the personnel files. According to LaCotti, the audit file and the personnel files were Dawson's responsibility. Dawson mentions they were the responsibility of someone else. (Ad. Hrg., 465-67).

**p.      Warning PAR - January 2002**

In January of 2002, LaCotti gave Dawson a "Warning PAR" in which he rated her

an DNME.  The Warning PAR contained a lengthy "performance summary" which

discussed Dawson's perceived deficiencies.  It also contained a notification that

"Dawson is being given a 90-day opportunity period to demonstrate performance to

an acceptable level of at least "Meets Expectations."  LaCotti offered "the following

assistance and guidance" with respect to the 90-day opportunity period:

> (1)     Ms. Dawson will be encouraged to locate and review those sections of the Manual of Investigative and Operations and Guidelines (MIOG), the Manual of Administrative Operations and Procedures (MAOP), and the Correspondence Guide which are pertinent to his/her assignments, paying particular attention to reporting and other specified requirements.

> (2)     The rating official will encourage Ms. Dawson to develop and utilize a personal tickler system as a management technique to ensure assignments are completed in sufficient time to meet established time frames.

> (3)     Ms. Dawson will be asked to prepare a memorandum as to how he/she will improve his/her performance, including an outline of projected assignments and indicating what his/her goals are in this regard.

> (4)     At least weekly, the rating official will counsel Ms. Dawson as to her progress and any problems or deficiencies that she may have encountered during the prior work week.

> (5)     Ms. Dawson has been furnished with a copy of her Performance Plan for review, thereby reconveying the requirement of the Meets Expectations level which must be achieved through the opportunity period.

(EEO Invest., Ex. 23).

Dawson gave LaCotti an undated and unsigned twenty-seven page response to the Warning PAR on February 1, 2002.  In this response she disagreed with the factual assertions and conclusions contained in the Warning PAR calling them "ludicrous."  The following quote reflects the tenor of Dawson's response:

> The entire PAR is truly demeaning and a complete insult to this SAC Secretary; however, due to the treatment of this SAC Secretary by this Rating Official, it is not surprising, but after a while this SAC Secretary would figure a true professional will eventually begin to get on with the professional workings of this office rather than repeatedly dwell(sic) on trivial, extremely small, untrue matters.

(EEO Invest., Ex. 24, p. 21)

LaCotti treated Dawson's response as a request for reconsideration of the Warning PAR.  LaCotti denied the "Reconsideration Request" stating that he had thoroughly reviewed it and "found no facts that support a change in the performance rating for Ms. Dawson."  LaCotti noted that the Reconsideration Request contained grammatical errors, misspelling, and challenged his authority as a rating official.  He also noted that the Reconsideration Request continued Dawson's "obstinate, combative, and argumentative" tone in dealing with performance issues "by dismissing factual presentations as completely inaccurate." (EEO Invest., Ex. 25, p. 1).

**q.    Warning Resolution PAR and Recommendation of Removal - May 1, 2002**

At the end of the Opportunity Period, LaCotti issued a Warning Resolution PAR rating Dawson as DNME during that time.  The Warning Resolution PAR contained a detailed performance summary including the results of weekly progress reviews LaCotti had with Dawson. (EEO Invest., Ex. 26).  Additionally on May 1, 2002,

LaCotti reported the results of the Opportunity Period to Administrative Services at "FBI HQ" and recommended that "Ms. Dawson be removed from the ro[ll]s of the FBI." (EEO Invest., Ex. 27, p. 17).   Dawson responded with another lengthy "Reconsideration Request" which continued in the same tone of her reconsideration request to the Warning PAR. (EEO Invest., Ex. 28).

r.     **Schweitzer Arrives - May 6, 2002**

James K. Schweitzer ("Schweitzer") took over as SAC in the Columbia Division on May 6, 2002 and LaCotti returned to the position of ASAC.   On May 23, 2002, Schweitzer and LaCotti submitted a response to the reconsideration request, authored by LaCotti to Administrative Services at FBI HQ. (EEO Invest., Ex. 29).

s.     **Suspension - July 29, 2002**

OPR issued its findings on July 29, 2002, finding that Dawson had made the derogatory comment about LaCotti on February 12, 2001 and had been insubordinate on June 14, 2001.  Dawson was suspended without pay for seven calendar days and placed on probation for one year. (EEO Invest., Ex. 34).

t.     **Denial of Reconsideration Requests - August 27, 2002**

By letter dated August 27, 2002, Administrative Services notified Dawson that her requests for reconsideration of the DNME contained in the Warning PAR and Warning Resolution PAR were denied.   The denial contained an analysis of the record presented for review.   Administrative Services noted that Dawson's supervisors had "included distinct examples which supported the DN[ME] rating level assigned" and that Dawson "merely refuted the issues raised by your rating official instead of providing specific documentation." (EEO Invest., Ex. 30).

13

**u.     Demotion - October 25, 2002**

Leah M. Meisel ("Meisel"), Deputy Assistant Director–Human Resource Officer, Administrative Services Division, notified Dawson by letter of October 25, 2002, that she (Meisel), after reviewing all information supplied, had decided  not to remove Dawson but to demote her to a GS 6 Investigative Clerical Assistant position in the Columbia Division.  In this letter, Meisel noted that Dawson had mentioned "disparate treatment by your supervisors" in one of her written responses.  Meisel directed Dawson to the FBI's Office of Equal Employment Opportunity Affairs and/or its Office of Professional Responsibility. (EEO Invest., Ex. 31).

## Analysis of Claims

Dawson alleges that she suffered discrimination based upon her race, including being subjected to a racially hostile work environment, and reprisal for engaging in a protected activity.  A federal employee's right to be free from work place discrimination is protected by 42 U.S.C. § 2000e-16.

a.     Race Discrimination

While recognizing that all circumstances must be taken into account, the "proper object of inquiry" in evaluating a disparate treatment based on race, "is whether there has been 'discrimination' in respect of 'personnel actions affecting [covered] employees.'" Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981), quoting 42 U.S.C. § 2000e-16(a).  In order to establish discrimination "in respect of" personnel actions alleged to be discriminatory, a plaintiff has the "burden of showing an 'ultimate employment' action that affects 'hiring, granting leave, discharging, promoting, and compensating.'" Brockman v. Snow, 217 Fed. App. 201, 205, 2007 WL 493926 (4th Cir. 2007), quoting Page v. Bolger, 645 F.2d at 233.

14

In her first cause of action for racial discrimination, Dawson does not specifically identify any adverse personnel actions that were taken against her, but generally alleges that Pelkey was treated more favorably than she.  Review of the record, reflected by the "facts" discussed above, indicates that only two adverse personnel actions were taken involving Dawson–her suspension by OPR and demotion by Administrative Services.  Therefore, this Report and Recommendation will focus on those two events.

In a disparate treatment case, the plaintiff must prove that "but for" her race, she would not have been subjected to an adverse employment action. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986).  A plaintiff can prove the defendant's discriminatory motive by two methods.  First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue.  In the alternative, a plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)." EEOC v. Clay Printing Co., 955 F.2d 936 (4th Cir. 1992).

The McDonnell-Douglas proof scheme consists of three stages.  Initially, the plaintiff must produce sufficient evidence to establish a prima facie case of discrimination. Gillins v. Berkeley Elec. Coop., Inc., 148 F.3d 413, 415 (4th Cir. 1998); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999).  Next, if plaintiff succeeds in submitting evidence to the Court to establish her prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employment action taken.  Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996).  Last, once the defendant has satisfied this burden, it then shifts to plaintiff to prove the proffered reason is merely a pretext for discrimination.  Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

15

1.     Prima Facie Case

The establishment of a prima facie case of race discrimination would appear to be different for each of the personnel actions.  Dawson's suspension should be analyzed as disparate treatment in discipline.  See <u>Moore v. City of Charlotte, NC</u>, 754 F.2d 1100 (4th Cir.), <u>cert. denied</u>, 472 U.S. 1201 (1985).  On the other hand, Dawson's demotion was based primarily on poor work performance.  In any event, defendants concede that Dawson can establish a prima facie case with respect to her claims of disparate treatment. (Def. Mem., p. 25).

2.     Pretext

Defendants have articulated legitimate, non-discriminatory reasons for Dawson's suspension and demotion, i.e., the investigations by OPR and the review of Administrative Services which determined that she violated FBI policy by using a derogatory term to describe LaCotti and was insubordinate and that her work performance was substantially substandard.  Therefore, Dawson must rebut these reasons.  She may do this by showing that the reasons articulated by her employer are false.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000).  Alternatively, she may demonstrate that the totality of the circumstances establishes that her employer's profferrred reason, although factually supported, "was not the actual reason relied on, but was rather a false description of its reasoning...manufactured after the fact." <u>Dennis v. Colleton Medical Ctr., Inc.</u>, 290 F.3d 639, 648 (4th Cir. 2002).

According to Dawson, LaCotti was the only person who discriminated against her though others condoned it. (Ad. Hrg., 64).  She testified:

> Mr. LaCotti did not like me in the position of...secretary to the Special Agent in Charge.  He discriminated against me because of my race...His main goal was to remove me from the rolls of the FBI, and he was not going to stop until he do that.  He was not happy with me.  He was a racist.  He was just a racist.

(Id. at 22).  Thus, Dawson's position is that the meticulous recitation of her deficiencies presented in the record before the Court was fabricated by LaCotti because of his racial prejudice.  There are at least two problems with Dawson's argument.  First, Burttram documented continuous problems with Dawson's behavior and performance.  Second, the final decisions on the personnel actions were made by OPR and Administrative Services after thorough investigation and review.

The only evidence in the record is that Burttram initiated the referral to OPR. (Ad. Hrg., p. 327).  Dawson asserts that the referral was made by LaCotti because he signed the OPR Notification form dated October 5, 2001, after Burttram's departure. (Pl. Mem., Ex. 7).  Review of the form indicates that the notification is dated October 5, 2001.  The form shows that the OPR investigation was initiated on that date.  The form was generated on October 5, 2001, by OPR and forwarded to the SAC in the Columbia Office, i.e., LaCotti.  He presented the notification to Dawson on October 11, 2001.  This notification does not indicate when or by whom the matter was referred to OPR.  The form does not contradict Burttram's testimony that he referred the matters to OPR.

OPR did not rubber stamp the referral alleging Dawson's misconduct.  The investigation took over nine months.  As discussed above, OPR found two of the allegations substantiated and referred the third back to the Columbia field office.  Dawson was interviewed by OPR (Pl. Mem., p. 5).  OPR carefully analyzed all the written communications on these issues that are a part of the record in this case and made factual findings as to Dawson's conduct.  These included electronic communications ("EC's") and signed sworn statements ("SSS's") of Dawson, Burttram, Pelkey, LaCotti, Jacques Stover and Robert Newhart.  In addition to making the finding as to the two incidents (SOB and insubordination), OPR also found that Dawson was rude to Dallis (office disruption) and engaged in other conduct that was "unconventional and disruptive to the professional decorum excepted [sic] in the Division front office." (EEO Invest., Ex. 35, p. 21).

17

OPR concluded:

> The evidence reveals that Ms. Dawson exhibited an unprofessional demeanor and frequently disrupted the workplace with her inappropriate comments and behavior. She was disrespectful towards the ASAC when she called him a derogatory name and towards the SAC when she blatantly ignored his order to wait for Ms. Pelkey's return. The fact that the SAC frequently counseled Ms. Dawson and even wrote two ECs to literally state the type of behavior he expected of a professional working in the front office, clearly shows that Ms. Dawson's peculiar conduct was an ongoing problem.

(Id.)

Likewise, Administrative Services fully reviewed Dawson's reconsideration requests concerning her Warning PAR and Warning Resolution PAR. Vanessa Wilson, Lead Human Resources Specialist, "conducted a substantive review of both [Dawson's] PARs, the Performance Plan upon which they were based, the documentation [Dawson] furnished as well as the information furnished by [her] rating and reviewing officials." (EEO Invest., Ex. 30). Wilson specifically addressed each critical element in the PARs and sustained the DNME ratings. Wilson summarized Dawson's responses to the PARs as follows:

> While you addressed the issues raised in each CE, you merely negated most of the deficiencies and attempted to justify others. For example, you repeatedly stated that you displayed the ability to accomplish all assignments in the requested manner and within the assigned time limits. However, you later stated that your rating official would give you an assignment and before being allowed to complete your assignment, he would give you another, with a higher priority. You stated this would delay your previous project. However, as stated in your Plan for CE #1, you are required to independently organize and prioritize your work activities to appropriately complete same within the requested time frames.
>
> In addition, you stated that when your rating official addressed various deficiencies that you made, you would immediately correct them as directed. However, documentation from both you and your rating official revealed that you were combative on various occasions in completing the requested modifications. For example, when asked to correct the file number for an incoming communication on December 2001, you informed this [sic] was the way that it had been done for years instead of correcting it without incident.

(Id.).

With respect to the proposed removal, Dawson submitted a written response to Meisel as well as an oral reply. After reviewing all the available information, Meisel made the decision not to terminate Dawson, but to demote her. (EEO Invest., Ex. 31).

Dawson has failed to present evidence which could reasonably permit an inference that defendant's proffered reasons for her suspension and demotion were pretextual. To establish pretext, a plaintiff must produce evidence that shows that defendant's "assessment of her performance was dishonest or not the real reason" for the employment decision. Hawkins v. Pepsico, Inc., 203 F.3d 274, 280 (4th Cir. 2000). "[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1988).

> The court's focus is not on the Defendant's business judgment or the fairness of its actions, but on its motivation. Thus, when an employee gives a reason for...[its employment actions], it is not the Court's province to decide whether the reason was wise, fair, or even correct, so long as it truly was the reason for the employer's action. Accordingly, it is not enough to a plaintiff to show that the [suspension or demotion] was based on groundless complaints, or that the employee did not, in fact, violate [the employer's] rules prior to the [adverse action]. [D]enial that misconduct occurred, or claim that reported events did not, in fact, occur is not material to finding pretext...Similarly, it is not enough to "dispute the correctness of the outcome of investigations" into misconduct.

Davis v. Seven Seventeen HB Philadelphia Corp. No. 2, 2003 WL 21488523 (M.D.N.C.) (unpublished) (internal citations and quotation marks omitted).

Dawson's lengthy and continuous protests over the merits of the reasons for her suspension and demotion are irrelevant. Both actions were independently reviewed under FBI procedure and upheld. Dawson's testimony and evidence shows at most that OPR and Administrative Services reached incorrect conclusions.

3.    45 Day Rule

Defendants assert that Dawson's disparate treatment claims, i.e., her suspension and demotion, should be dismissed because she failed to make timely contact with the FBI's EEO Office after the alleged discrimination.  The regulation, 29 C.F.R. 1614.105(a)(1), requires the employee to contact the EEO officer "in the case of a personnel action within 45-days of the effective date of the action."  The record shows that Dawson made an initial official contact with the EEO office on September 19, 2002. (Def. Mem., Ex. 20, p. 16).  Her demotion occurred **after** that date, in October of 2002, so Dawson's EEO contact concerning that personnel action clearly does not violate the regulation.

The letter from OPR advising Dawson that she was to be suspended is dated July 29, 2002 (EEO Invest., Ex. 34).  A notation at the bottom of the letter indicates that it was presented to Dawson on August 6, 2002, and that she intended to file an appeal.  Instructions relating to the personnel action state that the suspension would be held in abeyance during an appeal.  Further, the SAC was required to notify Dawson of the effective dates of the suspension "and notify the employee of those dates, within seven calendar days of the employee waiving his/her right to appeal, failing to appeal after thirty calendar days, or termination of the appellate process." (Id. at pp. 8-9).  Defendants have not established when the personnel action of suspension actually occurred.  Assuming at least a thirty day period for the appeal, the personnel action most probably occurred after Dawson's initial EEO contact on September 19, 2002.  Defendants have not shown that they are entitled to summary judgment on this ground.

b.    Hostile Work Environment

Dawson alleges that her supervisor, LaCotti, subjected her to a racially hostile work environment.  To prevail on such a claim, a plaintiff must show the harassment was: (1) unwelcome,

(2) based on race, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) that there is some basis for imposing liability on the employer. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001). Defendants assert that Dawson cannot show that any of LaCotti's actions about which she complains were based on her race, nor has she shown that those actions were sufficiently severe and pervasive to create an abusive work environment.

Dawson argues three components comprise her harassment claim. First, LaCotti yelled at her during counseling sessions. Second, he grabbed her by the arm at the retirement luncheon. Last, LaCotti wore or possessed his firearm when he counseled her. The factual predicate for these components is weak. LaCotti denies yelling at Dawson (Ad. Hrg., 473) and no other witness corroborates her testimony. Dawson never testified that LaCotti grabbed her by the arm when discussing the lack of coverage of the front office at the retirement luncheon. LaCotti did not recall grabbing Dawson by the arm, but testified it was possible that he touched her on the arm. (Id., 474). Gail Butler, an FBI employee, is the only witness who recalled LaCotti touching Dawson. She testified that at the retirement luncheon, LaCotti 'grabbed her by the arm and pulled her away...[H]e just kind of pulled away. It wasn't anything rough or anything, just grabbed her by the arm and said excuse me...I just remember them going away from us so they could have their conversation." (Id. 185). Further, LaCotti testified that he never wore his firearm in the office, but stored it in a safe location out of sight. (Id. 478). Dawson testified:

> When [LaCotti] would be sitting at his desk he would move as if he was going to do something...But I never knew–I was nervous a lot of times because I knew where the ASAC and SAC kept their guns because they're not street agents, they don't wear them on them a lot of times so I was really nervous.

(Id. 52).

Dawson fails to establish a hostile work environment/harassment claim because she has not shown that the alleged actions were based on her race. See Hawkins v. PepsiCo, Inc., 203 F.3d at 280-282; Nichols v. Caroline County Bd. of Educ., 123 F.Supp.2d 320, 327 (D.Md. 2000)(black plaintiff's assertion that white supervisors subjected him to adverse employment actions "because I am who I am" insufficient;" [t]he court cannot attribute a racial character to the disagreement and misunderstandings between the parties based merely on [plaintiff's] conjectural opinion."); Sharafeldin v. Maryland Dep't of Pub. Safety, 131 F.Supp.2d 730, 741-43 (D.Md. 2001); see also Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003)(evidence of workplace disagreements between supervisors and subordinates concerning job duties and performance and of callous and insensitive treatment by supervisors is not sufficient to prove alleged harassment was based on plaintiff's race).

Dawson has not shown that any of the actions taken by LaCotti were based on her race. She has labeled him "a racist," but has offered no evidence to support her opinion. There is no suggestion from Dawson or any other witness that LaCotti used racially disparaging remarks or any other overt sign of racial prejudice. The conflict between Dawson and LaCotti centered around work-related issues. As discussed above, the actions taken by Burttram and LaCotti were all well documented and upheld after thorough review.

Additionally, Dawson has not shown that the FBI's alleged actions were sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment. In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,

and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993)). Among the circumstances examined are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 21.

The actions about which Dawson complains were not objectively offensive. Crediting Dawson's testimony, LaCotti frequently criticized her work, but Dawson has not shown that his actions were severe. The only physically threatening actions were LaCotti touching Dawson on the arm at the retirement luncheon and possessing a firearm. Dawson did not even remember LaCotti touching her. FBI agents carry firearms. There is no indication that LaCotti physically threatened Dawson, brandished his weapon, or showed it to her.

c.      Retaliation

Dawson asserts that defendants retaliated against her because she engaged in protected activity by complaining about discrimination. Defendants argue that this claim is barred because it was abandoned during the EEO proceeding, and even if considered on the merits, Dawson cannot establish a prima facie case of retaliation.

During the EEO process, Dawson's deposition was taken on November 22, 2004 (Pl. Dep.) During that deposition, Dawson's attorney put the following stipulation on the record concerning claims she was not pursuing:

> I've consulted with Ms. Dawson and explained to her that we're stipulating in this case it's not one that deals with sex discrimination, nor is it one that deals with national origin discrimination, nor it is one that deals with reprisal following the filing of the formal complaint and her demotion, which generates the complaint that's in question. We so stipulate.

(Pl. Dep. 116-17).

23

Defendants argue that by this stipulation, Dawson abandoned any claim she may have had for retaliation (Def. Mem. 27-28). Dawson asserts that the stipulation only stated that she was not pursuing any retaliatory acts which occurred after she made official contact with the EEO office on September 19, 2002. Defendants interpretation of the stipulation should be accepted because retaliation was not considered during the EEO hearing nor addressed in the order of the Administrative Law Judge.

To establish a prima facie case of retaliation, it must be demonstrated that:

(1)    the employee engaged in protected activity;

(2)    the employer took some adverse employment action against the employee; and

(3)    a causal connection existed between the protected activity and the adverse action.

See Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d at 460. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that the adverse action was imposed because the plaintiff engaged in protected activity. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

A plaintiff need not have filed a formal complaint with the EEO to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints are included within the definition of protected activity. Warren v. Halstead Industries,

Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

Even if Dawson's claim for retaliation is considered on the merits, defendants are entitled to summary judgment.[3]  Dawson has not identified when she made complaints, to whom she made complaints, or which acts she claims are retaliatory.  Dawson argues that she "repeatedly complained to numerous officials that she was being discriminated against by ASAC LaCotti. Additionally, ASAC LaCotti was aware of these complaints, because in one of her personnel review (sic) it notes that Ms. Dawson complained of discrimination on 1/8/2001." (Pl. Mem., 20).  Again, Dawson does not identify the officials, when she complained, or the acts about which she complains. Dawson makes no citation to the record to support her argument.

The undersigned assumes that Dawson is referring to her letter of January 8, 2001. (Def. Mem., Ex. 4).  The letter is not clear because it refers to a Burttram memorandum which is apparently not a part of the record before the Court.  The letter recounts a conversation between Burttram and Dawson.  A fair reading of the letter indicates that Dawson wondered if her treatment by LaCotti was based "on my being a different color in the front office."  Dawson states that Burttram told her he would not tolerate discrimination.  She goes on to state:

> (Y)ou instructed me to contact the EEO Counselors [in] this office, but I informed you that if I felt so...that I would not contact the EEO Counselors here, but rather those at FBI Headquarters with your being the SAC.

(Id.)

Dawson has pointed to nothing in the record to show that she contacted the EEO counselors at FBI headquarters to complain of racial discrimination.  The deposition of Dawson in this case

---

[3]Probably because the claim was abandoned, it is not well developed in the record or the briefs of the parties.

shows an initial contact with the EEO counselor on September 19, 2002 and that she had an interview with the counselor on September 30, 2002 (Pl. Dep. II, 152). Dawson testified that she made an EEO contact prior to September 19, 2002, but she could only say that "[i]t would have been after July of 2000 (LaCotti's arrival) and prior to September of 2002." (Id. at 151). With this imprecise testimony, it would be impossible to determine which of LaCotti's acts Dawson claims were retaliatory.

Further, Dawson has not shown that LaCotti was aware that she made an EEO contact prior to September 19, 2002. The letter of January 8, 2001 only indicated that Dawson would contact the EEO counselors at FBI headquarters if she felt she had suffered discrimination. Dawson has not identified any part of the record which would show that she actually contacted the EEO office before September 19, 2002 which would have given LaCotti knowledge that she had made an EEO contact. Since Dawson has not shown that LaCotti had knowledge that she had complained of race discrimination prior to September 19, 2002, she has not established a prima facie case of retaliation, because without such knowledge, there can be no causation. Baqir v. Principi, 434 F.3d 733, 740 (4th Cir. 2006).

    d.    Compensatory Damages

Defendants assert that Dawson's claim for compensatory damages[4] should be stricken because Dawson failed to exhaust her administrative remedies by including a claim for compensatory damages in the EEO process. In this context "compensatory damages" means "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses..." Seay v. Tennessee Valley Auth., 340 F. Supp. 2d 844, 847

---

[4]In the "Prayer for Relief" in the Complaint, Dawson asks for "compensatory damages of the statutory maximum for each Cause of Action contained herein, which the jury should find appropriate as a result of the Defendant's unlawful discriminatory actions taken as a result of Race."

(E.D.Tenn. 2004) quoting Landgraf v. USI Film Products, 511 U.S. 244 (1994). See also, 42 U.S.C. § 1981a.

A plaintiff is required to exhaust her administrative remedies on her Title VII claims prior to seeking judicial relief in federal court. Brown v. General Services Administration, 425 U.S. 820, 832 (1976). This requirement specifically applies to claims for compensatory damages. Seay, 340 F.Supp.2d at 838.

Before filing a Title VII complaint in the United States District Court, a plaintiff must first exhaust his administrative remedies. See 42 U.S.C. § 2000e-5(b) and Bryant v. Bell Atl. Md. Inc., 288 F.3d 124, 132 (4th Cir. 2002). The exhaustion requirement "serves the complementary goals of providing employers fair notice of alleged discrimination and of enabling the EEOC to pursue a reconciliation between the disaffected employee and his employer." Carter v. Rental Unif. Serv. of Culpeper, Inc., 977 F.Supp. 753, 758 (W.D.Va. 1997). Generally, a federal district court does not have subject matter jurisdiction under Title VII of claims omitted from the EEOC administrative charge. Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995). The court must liberally construe the EEOC charge, because "lawyers do not typically complete the administrative charges." Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005). The employee's claims in this court are not strictly limited by the allegations contained in the EEOC charge, and the plaintiff may pursue a claim if it is "reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation." Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000).

> We note that the employee need not present his claim for compensatory damages in a legal or technical manner. He must, however, inform the employing agency or the EEOC of the particular facts of the case that demonstrate that he has suffered an emotional and/or mental injury that requires the payment of compensatory damages to make him whole. Such facts obviously must demonstrate more than the mere fact of forbidden discrimination or harassment. We do not seek

to place an undue burden on Title VII claimants, who often proceed pro se during the administrative investigation. Even a pro se claimant, however, should recognize the importance of informing the employing agency or the EEOC of the pertinent facts of his complaint and injury. Once the agency is put on notice of facts that may justify an award of compensatory damages, the burden shifts to the employing agency to investigate the claim for compensatory damages. For example, if the claimant notifies the agency that he was hospitalized as a result of illegal harassment, then an offer of full relief must either offer to reimburse the employee for the damages sustained or otherwise explain why damages are not being offered.

Fitzgerald v. Secretary, U.S. Dep't of Veterans Affairs, 121 F.3d 203, 208 (11th Cir. 1997).

In the present case, Dawson's complaint presented to the agency does not ask for compensatory damages.[5] (EEO Invest., Ex. 2).  The factual recitation contained in the EEO Complaint provides no inference that Dawson is seeking compensatory damages.  Further, Dawson has pointed to no facts developed during the EEO process that would justify an award of compensatory damages.

## Conclusion

Based on a review of the record and the above discussion, it is recommended that defendants' motion for summary judgment be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

January 25, 2008
Columbia, South Carolina

---

[5]In the space for corrective action sought, Dawson only states that she wants "(t)o be treated professionally as should be the case for all FBI employees, and be allowed to perform my duties as SAC Secretary in a business type rather than hostile workplace type environment."